424 F.2d 783
 137 U.S.App.D.C. 295, 84 P.U.R.3d 67
 The JUPITER CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Phillips Petroleum Co.
and Kerr-McGeeCorp., Tennessee Gas Pipeline Co.,
Long Island Lighting Co., Intervenors.
UNION OIL COMPANY OF CALIFORNIA, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Tennessee Gas Pipeline
Co., The JupiterCorporation, Phillips Petroleum
Co., and Kerr McGee Corp., Long Island
LightingCo., Intervenors.
The JUPITER CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 22154, 22442, 22693.
United States Court of Appeals District of Columbia Circuit.
Argued May 8, 1969.
Decided Oct. 10, 1969.
 
 Mr. William W. Brackett, Chicago, Ill., with whom Mr. Donald W. Glaves was on the brief, for petitioner in Nos. 22,154 and 22,693.
 Messrs. John C. Snodgrass and John L. Murchison, Jr., Houston, Tex., for petitioner in No. 22,442.
 Mr. David V. Stover, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, Peter H. Schiff, Solicitor, and Robert C. McDiarmid, Asst. to the Gen. Counsel, Federal Power Commission, were on the brief, for respondent.
 Mr. Howard C. Westwood, Washington, D.C., with whom Messrs. Herbert Dym, Paul S. Hoff, Washington, D.C., and John R. Rebman, Bartlesville, Okl., were on the brief, for intervenors, Phillips Petroleum Co. and Kerr McGee Corp. in Nos. 22,154 and 22,442.
 Mr. Melvin Richter, Washington, D.C., with Mr. Jack Werner, Washington, D.C., was on the brief for intervenor, Tennessee Gas Pipeline Co. in Nos. 22,154 and 22,442.
 Mr. Morton L. Simons, Washington, D.C., entered an appearance for intervenor, Long Island Lighting Company in Nos. 22,154 and 22,442.
 Before FAHY, Senior Circuit Judge, and BURGER* and TAMM, Circuit judges.
 TAMM, Circuit Judge:
 
 
 1
 Petitioners, the Jupiter Corporation and Union Oil Company of California, seek review of declaratory orders of the Federal Power Commission regarding certain rates to be charged by Jupiter, owner and operator of an underwater pipeline system offshore of Louisiana in the 'Rollover Field.' Petitioner Union and the Phillips Petroleum Company and Kerr-McGee Corporation (PKM), joint venturers and intervenors in these suits, are producers of gas in the Rollover Field who transport it to shore through Jupiter's pipeline. Jupiter receives natural gas and liquid condensate[1] produced by these companies for transport to shore, where the condensate is separated out and the natural gas is delivered to the pipeline purchaser, Tennessee Gas Pipeline Company, also an intervenor in these cases.
 
 
 2
 In 1962, the Commission instituted an investigation to determine the just and reasonable rates to be charged for Jupiter's transportation of gas from the producers to Tennessee. Jupiter Corp., 28 F.P.C. 942 (1962). As a result of this proceeding and the ensuing 1966 settlement, detailed below, Jupiter's rates were substantially reduced. Sometime thereafter, Jupiter took the position that it was entitled under its contracts with the producers to charge the producers for transportation and processing services related to the liquid condensates in an amount equal to the reductions in its rates chargeable to Tennessee. The producers disagreed.
 
 
 3
 The resulting controversy does not yield to easy summary. Jupiter sued PKM and Union in state and federal courts in Illinois for amounts allegedly due it under its theory of the contracts. Because of the different formats of Jupiter's transactions with the producers, Jupiter's claimed rights have led it (1) to withhold from PKM sums which PKM asserts are due it under the lawful filed rate for its gas and (2) to charge Union more than Union claims it owes under its contract for Jupiter's services. Because Union claims the right to pass all of Jupiter's charges on to Tennessee, Tennessee has been charged amounts for transportation in excess of the settlement rate. PKM and Tennessee therefore sought action from the Commission to enforce their rights under the 1966 settlement. The Commission responded with the declaratory orders here under review, rejecting the claims of Jupiter and Union.
 
 
 4
 The issues presented on these petitions for review are simpler than their setting. Jupiter contests the Commission's orders on the ground that the orders compel an unlawful increase in the price it is contractually bound to pay PKM for gas. Union petitions for review of the orders in an effort to establish a right to recover from Tennessee any and all of Jupiter's charges to it regardless of whether the charges are attributable to transportation of gas to Tennessee. Other issues in the cases are the Commission's assertion of jurisdiction to regulate Jupiter's rates for transportation of liquid condensates, as opposed to the gas portion of the gas stream, and two subsidiary procedural questions. We have concluded that a decision on the jurisdictional question concerning the liquid condensates is unnecessary in the present posture of these cases. The orders of the Commission are otherwise affirmed in their entirety.
 
 I. BACKGROUND OF THE DISPUTE
 
 5
 A. Jupiter-Phillips-Kerr McGee (PKM) Operation
 
 
 6
 Pursuant to 1953 contracts, PKM sells natural gas to Jupiter which resells it to Tennessee under another contract. The liquid condensate portion of the gas stream is separated out by Jupiter and redelivered to PKM which sells it privately. Jupiter's payment for its service, therefore, is a 'spread,' amounting to the difference between what it pays PKM and what it collects from Tennessee. Until the rate investigation and settlement, this 'spread' amounted to an average of 2.4 cents per Mcf (1,000 cubic feet) of gas.
 
 B. Jupiter-Union Operation
 
 7
 Union retains the ownership of the gas transported by Jupiter to Tennessee, after removal of the condensates. Union's payment to Jupiter for its services was fixed by a 1957 'Hydrocarbon Gathering and Separating Agreement' providing for payment of 4 cents per Mcf of gas for the first 62,000 Mcf of gas handled daily, and 3 cents per Mcf for additional amounts. This charge based on volume averaged 3.4 cents per Mcf.
 
 
 8
 Union's price to Tennessee was determined in a 1962 settlement of the price then charged by Union's predecessor, the Pure Oil Company. Pure Oil Co., 28 F.P.C. 889 (1962). In lieu of a single rate to Tennessee previously set by contract, the settlement provided for a composite price consisting of 16.75 cents per Mcf, plus reimbursement by Tennessee of the amounts Union (then Pure) paid Jupiter for transportation of the gas.
 
 C. Rate Settlement
 
 9
 In December 1962, the Commission began an investigation of the reasonableness of Jupiter's rates under section 5(a) of the Natural Gas Act, 15 U.S.C. 717d (1964); Jupiter Corp., 28 F.P.C. 942 (1962). This investigation was finally terminated in the examiner's opinion and orders issued January 5, 1966. Jupiter Corp., 35 F.P.C. 1091, 1095 (1966). The examiner found that .632 cent per Mcf was a just and reasonable rate for Jupiter's transportation services to PKM and Union.
 
 
 10
 Jupiter then proposed a settlement under which it would receive 1.25 cents per Mcf for transport of gas to Tennessee. Jupiter further stated that, since its contracts did not provide separate charges for its services regarding the liquid condensates, an equitable settlement required reformation of its contracts or Commission permission for Jupiter to retain charges for such services. This offer was subsequently amended to propose a 1 cent charge for the gas transportation service, still reserving Jupiter's right to collect compensation for the other services from the producers.
 
 
 11
 The Commission accepted the settlement offer of a 1 cent charge. The settlement order contains the following statement with reference to Jupiter's claim for additional compensation from the producers:
 
 
 12
 Jupiter's reservation of claimed rights with respect to the collection from Union and Phillips-Kerr McGee of compensation for transporting, separating or storing those producers' condensates and liquefiable hydrocarbons * * * does not present any issue to be determined at this time. Any contractual arrangements Jupiter makes with the producers for those services will be acted upon if and when they are appropriately submitted to this Commission.
 
 
 13
 (35 F.P.C. at 1094.) Union and PKM objected to the settlement order in the belief that the above reference to the contract reformation issue implied that Jupiter had some rights to compensation for other services. This the producers denied. The Commission denied rehearing of the settlement order with the comment that the quoted statement neither implied that further arrangements were subject to negotiation, nor required that negotiations be held. Jupiter Corp., 36 F.P.C. 495 (1966). No one petitioned for judicial review of the order approving the settlement. On July 13, 1966, Jupiter forwarded new rate schedules in compliance with the order.
 
 II. THE JUPITER-PKM DISPUTE
 
 14
 Shortly before the Jupiter rate settlement, the Commission had entered orders setting PKM's price to Jupiter at no more than 18.5 cents per Mcf and Jupiter's price to Tennessee at no more than 20.9 cents. Phillips Petroleum Co., 34 F.P.C. 486 (1965) (hereinafter 'Opinion 470'). Thus the 'spread' retained by Jupiter was 2.4 cents. The effect of the 1966 settlement, reducing Jupiter's transportation charge to 1 cent, was to lower Jupiter's resale price to Tennessee by 1.4 cents to 19.5 cents.
 
 
 15
 From June 1966 through May 1967, Jupiter collected 19.5 cents from Tennessee and paid 18.5 cents to PKM, pocketing 1 cent. Since May 1967, however, Jupiter has claimed that under its contract with PKM, it may reduce its payments to PKM by the same amount that its payments from Tennessee are reduced, namely, by 1.4 cents or from 18.5 to 17.1 cents. In August, 1967, Jupiter sued PKM in the Circuit Court of Cook County, Illinois, on this theory of the contract to recover the 1.4 cents that it had paid PKM from June, 1966 to May, 1967. Since that time, Jupiter has tendered only 17.1 cents to PKM, consistent with its position that 17.1 cents is the contract price for gas.
 
 
 16
 PKM then filed a motion with the Commission requesting it to enforce payment at the 18.5 cent rate, as provided in the settlement order. On April 3, 1968, the Commission issued the declaratory order under review, Jupiter Corp., 39 F.P.C. 417 (1968), with the following findings regarding Jupiter's obligations in the PKM transaction:
 
 
 17
 (1) Jupiter is required to pay PKM the certificate rate of 18.5 cents per Mcf, and to charge Tennessee 19.5 cents per Mcf.
 
 
 18
 (2) Compensation for services other than transportation of that part of the gas stream delivered to Tennessee is a separate contractual issue for the courts, where any judicial remedy 'may well be a matter of equity rather than law.' (39 F.P.C. at 421.) The amounts at issue cannot be set off against the 18.5 cent certificate rate.
 
 
 19
 (3) The Commission would require Jupiter to obtain a certificate from the Commission for any rates to be charged PKM for the transportation portion of the liquid condensate service in the event that Jupiter recovered some payment for this service in its state court suit.
 
 
 20
 Jupiter sought rehearing of this order, which was denied in an order and opinion of May 24, 1968. Jupiter Corp., 39 F.P.C. 854 (1968). Because Jupiter's petition for rehearing expressed doubt, not to say disbelief, that the April 3 order required it to pay the 18.5 cent rate without set-off of amounts allegedly due for condensate services, the Commission attempted to dispel any confusion with the statement that 'to the extent that Jupiter may be found in its present court proceedings to be due some amount for the nonjurisdictional services performed, these amounts may not be commingled or confused with the amounts due for jurisdictional services in Jupiter's accounts' (39 F.P.C. at 855).
 
 
 21
 On July 1, 1968, PKM filed a motion with the Commission complaining that Jupiter continued to tender only 17.1 cents and requesting an enforcement order. This motion was renewed on October 16, 1968. In response to these motions, the Commission issued an order on December 13, 1968, stating that the only way to maintain the integrity of its April 3 and May 24 orders, pending this court's review, was to direct Tennessee to pay 18.5 cents directly to PKM (for the account of Jupiter) and 1 cent directly to Jupiter. Jupiter Corp., 40 F.P.C. 1455 (1968). Jupiter was also directed to pay over to PKM any amounts short of the 18.5 cent rate withheld since the 1966 settlement.[2] Jupiter sought a rehearing of the enforcement order, which was denied on January 22, 1969. Jupiter Corp., 41 F.P.C. 72 (1969). The Commission had stated that its December 13 order would be stayed if this court granted a stay of the April 3 order pending judicial review. The stay requested by Jupiter was denied by this court on February 6, 1969, so the December 13 order remains in effect.
 
 
 22
 The Jupiter-PKM dispute presents three questions for decision by this court: (1) whether the Commission properly required Jupiter to pay the 18.5 cent rate, without set-off; (2) whether the December 13 enforcement order exceeded the Commission's authority; and (3) whether the Commission has jurisdiction to certify rates for the transportation of liquid condensates as part of the natural gas stream.
 
 A. The Validity of the 18.5 Cent Rate
 
 23
 Everyone in this case agrees that gas companies must pay the filed rate for jurisdictional sales or services under the Natural Gas Act. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951). Jupiter cannot prevail in its attack on the 18.5 cent rate set in Opinion 470 unless it shows that the rate is unlawful. To do so, Jupiter asserts that 18.5 cents is higher than the rate provided in its contract with PKM and thus unlawfully relieves PKM of a bad bargain, contrary to the rule of United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). Under the Mobile rule, a gas company may not unilaterally increase its contract rate and the Commission is without authority to approve such an increase unless, under the holding in the companion case, F.P.C. v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), the contract rate is so low as to affect the public interest adversely.
 
 
 24
 Jupiter claims that the 18.5 cent rate is unlawful under Mobile because its contract with PKM permits it to deduct a 2.4 cent spread from whatever price is received from Tennessee. Thus, when its resale price to Tennessee was fixed at 19.5 cents in the rate settlement, the contract price payable to PKM became 17.1 cents. The contract, however, does not support this contention.
 
 
 25
 Provisions of the Jupiter-PKM contract on file with the Commission protect PKM's price for gas from any reduction in Jupiter's charges, whether the reduction is regarded as a reduction of Jupiter's spread or its resale price to Tennessee. Jupiter's claim that its price payable to PKM is to be reduced by the amount of any reductions in its price received from Tennessee was rejected by the examiner in the rate proceeding. He relied on the following supplement to the 1953 agreement, which became effective in 1958:
 
 
 26
 'If at any time and for any reason Marine (now Jupiter) is required to reduce the amount per Mcf specified * * * as the adjustment to be made to the applicable price * * * then the price payable to Phillips and KerrMcGee * * * shall not thereby be reduced, but shall be increased by an amount per Mcf equivalent to the amount per Mcf by which such (adjustment) amount * * * is reduced, to the end that Phillips and Kerr-McGee will receive for gas delivered * * * the applicable price per Mcf less only the amount per Mcf to which said (adjustment) amount * * * is reduced * * *.'
 
 
 27
 Jupiter Corp., 35 F.P.C. 1091, 1121-1122 (1966). The examiner concluded that as a result of this 'contractual shuttlecock,' if the adjustment amount is reduced, the price to the producers shall be increased by the amount of the reductions. Translated into figures, the provision means that if the 'applicable price' payable by Tennessee is reduced to 19.5 cents and the 2.4 spread is subtracted, the price to PKM does not thereby become 17.1 cents, because the amount of the reduction, 1.4 cents, is to be added to the price payable to PKM, bringing the total to 18.5 cents.
 
 
 28
 The Commission's action setting PKM's price at 18.5 cents and Jupiter's resale price to Tennessee at 19.5 cents fits the terms of the above-quoted provision. The Commission has reduced the 'adjustment amount' in the only way it could.[3] This reading of the contract as insulating PKM from reductions in Jupiter's rates chargeable to Tennessee is consistent, moreover, with the contract provision stating that Jupiter's transportation, separation and delivery of the condensates to PKM shall be 'free of cost and expense to Phillips and Kerr-McGee.'
 
 
 29
 We find no support for Jupiter's claim that it is entitled under its contract to convert that portion of the spread no longer chargeable to Tennessee into a charge to PKM for condensate services. The assertion that 18.5 cents exceeds the contractual price for PKM's gas and is unlawful under Mobile is groundless.
 
 
 30
 We have passed over the question of the timeliness of Jupiter's Mobile attack on Opinion 470 setting the 18.5 cent rate and the rate settlement setting the 19.5 cent rate, neither of which was appealed.[4] Perhaps recognizing that its Mobile argument has come to court late, Jupiter has advanced several other arguments, apparently designed to preserve its right to complain of the final orders on which the declaratory orders under review are based. Because we have dealt with its Mobile claim on the merits, Jupiter's other contentions require only brief comment.
 
 
 31
 Jupiter's response to the orders requiring payment of the 18.5 cent rate has been a long and elaborate demurrer. Choosing to skirt the merits of the Mobile attack on the filed rate, Jupiter instead makes the following assertions: (1) Opinion 470 setting PKM's rate at no more than 18.5 cents supports its contractual argument that the reduction in its transportation charge to Tennessee may be recouped from PKM, (2) the Commission has conceded that Jupiter has a contractual right to payment for non-jurisdictional services, and (3) any determination of the rate payable to PKM must await the outcome of the litigation in the Superior Court of Cook County. These arguments cannot be sustained.
 
 
 32
 First, it is clear that the ordering paragraph of Opinion 470 sets the rate payable to PKM at no more than 18.5 cents because that rate was a reduction from the prevailing price.[5] The reference in the body of the opinion to an 18.5 cent rate 'as limited by contractual rights' will not sustain the burden of Jupiter's argument; the opinion expressly contemplated reductions in Jupiter's spread and provided only a temporary certificate for the 20.9 cent rate to Tennessee. PKM, by contrast, received a permanent certificate for the 18.5 cent rate.
 
 
 33
 Second, the Commission has conceded nothing but the possibility that Jupiter has an equitable claim, disputed by PKM, for the reformation of its contract to require payment by PKM for nonjurisdictional services now that their cost is no longer being absorbed in an excessive charge to Tennessee. The Commission has never conceded that Jupiter is entitled under the contract as written to recoup any reductions in the spread chargeable to Tennessee from PKM. Indeed, the Commission scarcely had reason or occasion to do so. Jupiter's contractual argument was rejected by the examiner in the rate proceeding, and its settlement proposals stated in bold-faced type that reformation of its contract was required to enable it to collect payment for condensate services. Jupiter paid the 18.5 cent rate for nearly a year before filing its suit, based on its present theory of the contract, in the Cook County court. When Jupiter finally made its position on the contract somewhat more explicit in its petition for rehearing of the April 3 order, the Commission rejected it in the opinion denying rehearing.
 
 
 34
 Jupiter's related argument that the Commission has somehow acquiesced in resolution of the filed rate issue by the Cook County court is similarly without merit. Jupiter has, it is true, attacked the 18.5 cent rate in its contract action. It seeks not reformation but recovery of the full 1.4 cent reduction claimed to be due it under the contract, and may have intended to urge its Mobile argument in reply to PKM's likely defense that 18.5 cents is the lawful filed rate for its gas. We find, however, no authority for deference to state court adjudication of filed rates in the natural gas industry.[6] An attack on a rate order is the classic case for primary jurisdiction in an administrative agency. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); cf. Ambassador, Inc. v. United States, 325 U.S. 317, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945). As the Mobile case itself makes clear, Jupiter's challenge to the validity of the 18.5 cent rate was properly addressed to the Commission and subject to judicial review on appeal from its orders.
 
 
 35
 B. The Validity of the Enforcement Order of December 13, 1968
 
 
 36
 Because we uphold the Commission's declaratory orders of April 3 and May 24, 1968, the sole question presented here relates to the Commission's authority to enter the enforcement order of December 13, 1968, Jupiter Corp.,40 F.P.C. 1455, and the possibility that the Commission abused its discretion in fashioning the administrative sanctions. Jupiter attacks the order on two grounds. First, it argues that the order requiring Tennessee to pay 18.5 cents directly to PKM for the account of Jupiter and 1 cent directly to Jupiter and requiring Jupiter to pay over shortages withheld from the 18.5 cent rate was an invalid modification of the declaratory orders pending their appeal. 15 U.S.C. 717r(b) (1964). We disagree. The Natural Gas Act provides that orders of the Commission shall not be stayed pending appeal unless the reviewing court grants a stay. 15 U.S.C. 717r(c). Only after the December 13, 1968, order did Jupiter apply for stay of the outstanding orders here under review, and its application was denied. In the absence of a stay, the Commission's orders were 'entitled to have administrative operation and effect during the disposition of (these) proceedings.' Dyer v. S.E.C., 289 F.2d 242, 244 (8th Cir. 1961). We think this includes compliance by parties subject to them. The course of these proceedings, traced in the record before us, supports the Commission's judgment that its implementing order was necessary to assure Jupiter's compliance with the declaratory orders. While Jupiter claims it did not interpret the Commission's declaratory orders to require it to pay the 18.5 cent rate without set-off, we find in them slight basis for confusion. An otherwise valid enforcement order is not transformed into an invalid modification of prior orders pending appeal whenever a non-complying party claims to have misunderstood their meaning.
 
 
 37
 Jupiter's second argument is that the Commission's only recourse in the face of its failure to comprehend or comply with the orders was to bring an action for mandamus in a Federal District Court, as authorized by section 20 of the Natural Gas Act, 15 U.S.C. 717s (1964). The Commission maintains that the mandamus remedy is permissive, not exclusive, and enables it to seek judicial assistance in enforcing its orders over parties not otherwise fully subject to its administrative jurisdiction. The Commission issued the December 13 order under section 16 of the Act, 15 U.S.C. 717o (1964), which empowers the agency to issue such orders 'as it may find necessary or appropriate to carry out the provisions' of the Act.
 
 
 38
 The language of section 20 supports the conclusion that a judicial remedy is discretionary, cf. General Telephone Co. of California v. F.C.C.,134 U.S.App.D.C. 116, 413 F.2d 390 (1969), and we think the enforcement order was a permissible step to secure compliance with the rate orders. Interpreting section 16's counterpart in the Federal Power Act, 16 U.S.C. 825h (1964), this court observed that
 
 
 39
 While such 'necessary or appropriate' provisions do not have the same majesty and breadth in statutes as in a constitution, there is no dearth of decisions making clear that they are not restricted to procedural minutiae, and that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.
 
 
 40
 Finally, we observe that the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives.
 
 
 41
 Niagara Mohawk Power Corp. v. F.P.C., 126 U.S.App.D.C. 376, 381-382, 379 F.2d 153, 158-159 (1967). We recognize with the Commission that the remedy chosen is 'somewhat unusual,' but we find that in the circumstances of this case, the order was reasonably calculated to prevent further aggregation of sums owed to PKM under the outstanding orders, and conformed to the purposes of the Act by enforcing the lawful filed rate as to all parties.
 
 
 42
 C. Jurisdiction To Regulate the Rates Charged for Transportation of Liquid Condensates
 
 
 43
 The Commission stated in its declaratory orders that Jupiter would be required to obtain Commission approval of rates charged for the transportation of liquid condensates in the event that it was held to be entitled to compensation for this service in its Illinois law suits. Jupiter contends that the Commission's stated intention to regulate charges for this service inexplicably singles out Jupiter for regulation not imposed on other pipelines, and exceeds the Commission's jurisdiction under the Natural Gas Act. We think it appropriate to comment on the first point, but unnecessary to decide the second.
 
 
 44
 Jupiter relies heavily on the Commission's Notice of Proposed Statement of General Policy, 33 Fed.Reg. 2860 (1968), to show that the Commission's assertion of jurisdiction to regulate rates for transportation of liquids is inconsistent with its previously stated position on the question. The Notice states an intention to allocate transportation costs for condensates and to deduct them from the jurisdictional cost of service in reviewing and setting rates chargeable to a pipeline's sales of natural gas for resale, regardless of whether a charge for liquid transport is actually made to the producer. The Commission's objective is to avoid charging the pipeline customer for a portion of transportation facilities not used for its benefit.
 
 
 45
 The Commission observed in the Notice that costs for condensate transport may be significant in some areas, referring to transport of liquids produced offshore to onshore extraction plants (the situation in this case), but stated that on an overall basis, the problem will not be substantial. The Notice then states:
 
 
 46
 Of course, we reserve the right to consider the problem in any future area proceeding where it appears to involve a generally significant factor in pipeline costs. We have reached a tentative conclusion that it might be preferable and sufficient for purposes of consumer protection, to allocate out of the cost of service applicable to other jurisdictional services the liquid transportation costs in pipeline cases, leaving it to the pipelines to negotiate fair compensation from the owner of the liquids or the liquefiable hydrocarbons.
 
 
 47
 The Commission's tentative policy rests on the assumption that it has jurisdiction to regulate charges for transportation of liquids, but because of the generally insubstantial costs,[7] there will ordinarily be no need to exercise it. If a pipeline's costs and charges for liquid condensate transportation are, for some reason, substantial, the tentative policy is by its terms inapplicable. We think, therefore, that the Notice does no more than reserve the question of regulation of rates for condensate transport for a case where these may be significant.
 
 
 48
 The Commission's assertion of this jurisdiction in this case anticipates the possibility of a favorable decision by the Illinois courts on Jupiter's claims for compensation for condensate services, including the transportation portion. In our view, the jurisdictional issue will not be ripe for decision until it is decided that Jupiter is entitled to compensation for this part of the service. First, it is possible that Jupiter will be held to be entitled to nothing for transportation of condensates or to be due an amount so insubstantial that the Commission will abstain from exercising jurisdiction. Of equal significance is the fact that the jurisdiction issue is not a simple one, to be resolved in the abstract by trading definitions of natural gas. The authority to regulate rates for transportation of liquid condensates is a matter to be considered against the background of the Commission's overall responsibility for rates and charges by natural gas companies 'for or in connection with the transportation or sale of natural gas' subject to its jurisdiction. 15 U.S.C. 717c(a) (1964). The mere possibility that Jupiter will be entitled to payment for this service does not suffice for the concrete record required for a reasoned judgment on a question of this kind.
 
 
 49
 In summary, we find that Jupiter is and has been obligated to pay the filed rate of 18.5 cents without set-off. The certificate rate does not exceed the contract price, and accordingly is not unlawful under the rule of the Mobile case. The possibility that Jupiter will recover some payments from PKM for condensate services in its Illinois lawsuit may eventually mean a reduction of total amounts owed by Jupiter to PKM, but this contingency does not entitle Jupiter to set off unliquidated claims against the filed rate for jurisdictional services. In the absence of a stay of the declaratory orders under review, the Commission's administrative order enforcing Jupiter's previously determined obligations was a valid exercise of discretion. Its assertion of jurisdiction to regulate rates for transport of liquid condensates presents no concrete question which must be decided at this time.
 
 III. THE JUPITER-UNION-TENNESSEE DISPUTE
 
 50
 Until 1962, the Pure Oil Company (Union's predecessor) sold gas directly to Tennessee at a flat contract rate of 21.3 cents per Mcf. In an entirely separate transaction, Pure paid Jupiter for transportation and other services under a 1957 'Hydrocarbon Gathering and Separating Agreement' providing for an average charge of 3.4 cents per Mcf based on volumes of gas gathered. The Jupiter-Pure contract rate covered Jupiter's services 'in gathering the gas and condensate subject to this agreement and separating condensate from the gas at (Jupiter's) plant, and for performing all other services provided for hereunder, exclusive of compression. * * *'
 
 
 51
 In 1958, Pure filed a rate increase applicable to Tennessee which was suspended by the Commission pending investigation of its reasonableness. Pure then filed a settlement proposal. A settlement agreement requiring a reduction of the total rate was concluded on November 27, 1962. Pure Oil Co., 28 F.P.C. 889 (1962). Approval of the settlement was conditioned upon conformity to a rate schedule which provided that Pure would charge Tennessee 16.75 cents per Mcf for gas, plus transportation charges. 28 F.P.C. at 892, 894. In an annotation to the rate schedule, transportation charges were described as follows:
 
 
 52
 Jupiter Oil Corporation charges Pure for transportation from the field * * * to (the) Tennessee Gas Transmission Company main line on shore. The charges are 4.0cents per Mcf * * * for the first 62.5 MMCDF and 3.0cents per Mcf * * * for the remainder. These charges to be recouped from Tennessee as part of the rate will be only those actually paid by Pure to Jupiter * * *.
 
 
 53
 Id. at 895 n. 9. The opinion approving the composite settlement rate stated that 'Pure has agreed to charge only that amount it actually has to pay for the transportation of the gas onshore, and to make any necessary filing in the future to reflect any change that may be made therein' (28 F.P.C. at 891). In a footnote to the appendix of rates, the Commission observed that 'any reduction in charges by Jupiter will thus reduce payments by Tennessee to Pure.' 28 F.P.C. at 895 n. 9.
 
 
 54
 From 1962 to 1966, Tennessee reimbursed Union at the 3.4 cent rate that Union paid Jupiter. Then came the 1966 rate settlement, reducing Jupiter's transportation charges to Tennessee to 1 cent per Mcf. After the settlement, Jupiter began billing Union 1 cent for gas transported and 2.4 cents for the other services referred to in the 1957 agreement. Union refused to pay separate invoices, and after its offer to amend the contract to a unitary charge of 1 cent was rejected by Jupiter, Union paid Jupiter the 3.4 cents as a single rate. This charge it passed on in full to Tennessee.
 
 
 55
 Tennessee, after a short time, refused to pay more than the base price, and Union ceased all payments to Jupiter. Tennessee filed a petition with the Commission seeking to establish its duty to pay only the 1 cent settlement rate. Jupiter then sued Union in the United States District Court for the Northern District of Illinois, claiming that it was still entitled to the full 3.4 cents. Union impleaded Tennessee. Tennessee then successfully moved for suspension of the suit pending Commission action on Tennessee's petition.
 
 
 56
 In its April 3 order, the Commission declared that Union is obligated to pay Jupiter 1 cent per Mcf for gas transportation pursuant to Jupiter's amended Gas Rate Schedule and to charge Tennessee no more than 1 cent for transportation over and above its base rate.[8] Union contests the order on the ground that the 1962 Pure (Union) settlement requires Tennessee to reimburse it for whatever charges Union pays Jupiter, and that the base rate plus this total reimbursement is the filed rate for its gas. Union also asserts that the Commission improperly denied it an evidentiary hearing.
 
 
 57
 Union urges this interpretation of the 1962 settlement because of the impact of the 1966 reduction in Tennessee's transportation rate coupled with Jupiter's persistence in charging Union 3.4 cents, but the question can be resolved only on the basis of what was contemplated in the 1962 settlement. The context of that settlement refutes Union's claim.
 
 
 58
 The 1962 settlement does not state in terms that Tennessee's reimbursement of Union's payments for transportation of gas referred only to gas delivered to Tennessee, but this is the only reasonable construction of the agreement. Before the settlement, Tennessee was paying a flat price for gas. The change to the two-part price, with separate charges for gas and transportation, can hardly have been intended to obligate Tennessee to pay Union's costs for services unrelated to Tennessee's gas-- costs that Tennessee could not support in a rate case related to its own gas services. This result would be at odds with elementary principles of rate regulation.
 
 
 59
 In addition, under Union's vigorously stated view of the Jupiter-Union contract, Union could not have expected to collect anything other than transportation charges from Tennessee any more than the Commission intended for Tennessee to pay for other services. Union claims that the unitary rate in the 1957 Jupiter-Union agreement provides for payment only for transportation of gas, and that the condensate services were to be free. Thus, Union would have expected that a reduction in Jupiter's transportation charges would reduce what Union could recover back from Tennessee.
 
 
 60
 The dispute between Union and Jupiter arises from the fact that Jupiter claims that the unitary rate in its 1957 agreement with Union includes payment for services related to the condensate services, that these were not to be free, and that when the Commission reduced the transportation portion of the unitary rate, Jupiter was entitled to collect the remainder of the 3.4 cents from Union as payment for condensate services. The merits of this controversy over the 1957 agreement are irrelevant, however, to a decision on the validity of the Commission's declaratory order. The 1957 agreement between Jupiter and Union affects the charges recoverable by Union from Tennessee only to the extent that it was incorporated into the 1962 composite settlement rate; it was incorporated only to the extent of setting the initial rate for transportation of gas to Tennessee. The parties to the 1962 settlement thought they were agreeing upon a transportation charge for Tennessee. That Jupiter now claims to be entitled to collect more than that charge from Union to cover condensate services under its 1957 agreement with Union does not affect Tennessee's undertaking, despite Union's discomfiture.
 
 
 61
 Union also alleges that the Commission erred in denying it a hearing requested in Union's letter of October 18, 1967. First, the alleged request for a hearing was ambiguous at best, and could reasonably have been interpreted as a request for expedition of whatever proceedings the Commission undertook in ruling on the motions resulting in the orders under review.[9] Granting Union a generous benefit of the doubt, we turn briefly to the asserted grounds for a hearing.
 
 
 62
 Union says it would have shown that the Commission was wrong to state in its April 3 order that it would be 'most peculiar' for Tennessee to agree to pay for transportation of condensates for Union, since it is common practice for pipelines purchasing gas offshore and transporting it for producers to deliver condensates without a specific charge. This common practice is both familiar to the Commission[10] and inapposite to the case. Union concedes that 'typically the pipeline that bears the cost of the additional services relating to condensates and liquefiable hydrocarbons performs the functions itself and therefore has greater control over the costs of rendering such services.' Reply Brief for Petitioner Union Oil Co. at 15. It would indeed be peculiar for Tennessee to agree to bear the costs of a third party, Jupiter, for services solely benefitting Union. This argument, and the other asserted grounds for a hearing, relate primarily to factual issues in Union's contractual dispute with Jupiter and are of little relevance to Tennessee's obligation under the filed rate. In any event, Union raises no substantial issues requiring the presentation of evidence not already before the Commission during these protracted proceedings.
 
 The orders of the Commission are
 
 63
 Affirmed.
 
 
 
 *
 Circuit Judge Burger (now Chief Justice) did not participate in the disposition of this case
 
 
 [1]
 Some simple definitions are in order. The natural gas steam is a mixture of hydrocarbons, all of which can be liquefied at differing temperatures and pressures. Those classified as 'condensates' condense to a liquid more easily and can be removed by simple mechanical separation. 'Liquefiable hydrocarbons' are lighter hydrocarbons which must be removed by more sophisticated processing operations. Both types will be referred to as 'condensates' in this opinion
 
 
 [2]
 The Commission stated in its December 13 order that the amount due as of July 31, 1968, was approximately $650,000, and was accumulating at the rate of about $25,000 per month. See 40 F.P.C. at 1456, 1458 n. 6
 
 
 [3]
 Even if the reduction were treated as reducing only the 'applicable price' payable by Tennessee, with no effect on the 'adjustment amount,' the contract provides that the price payable to PKM is to be equal to the price per Mcf 'provided to be paid' by Tennessee, 'regardless of whether such price is actually paid,' less the adjustment amount. Thus the transportation charge is to be deducted from the contract price payable by Tennessee, and not from the lower price set by the Commission under its certificate authority
 From Jupiter's standpoint, the contract problem is created by the fact that the transportation charge is stated as a deduction from the price payable by Tennessee. The Commission could not set a fair price chargeable to Tennessee except by adding a reasonable transportation charge to the area rate of 18.5 cents set for PKM's gas. If the effect of this procedure was to deny Jupiter payment for nonjurisdictional condensate services, the cause was Jupiter's agreement to a contract which included them in a charge to Tennessee, a fact Jupiter has recognized. Cf. Jupiter Corp. v. F.P.C., 362 F.2d 92 (7th Cir. 1966).
 
 
 [4]
 Jupiter's appeal from the Commission's amendment of its temporary certificate at the 20.9 cent price in Opinion 470 was dismissed on its own motion as part of the 1966 rate settlement. Jupiter Corporation v. F.P.C., No. 15,469 (7th Cir., Nov. 10, 1966); cf. Jupiter Corp., 35 F.P.C. 1091, 1093 (1966)
 
 
 [5]
 The rate reductions ordered in Opinion 470 took place against this background. Under PKM's 1953 contract for the sale of gas to Tennessee's predecessor in interest, Niagara Gas Company, the gas was sold at 16.4 cents per Mcf for export to Canada. The contract contained an escalation clause providing for price revisions every five years, pegged to prevailing area prices. In 1958, the price to Niagara was renegotiated at 21.3 cents, only days before Tennessee succeeded to Niagara's interest in the gas supply. Because the ultimate sale previously had been to Canada, the sale was not considered to be jurisdictional and PKM was not required to file a notice of the increase with the Commission, making the rate change subject to review. Although one examiner who considered the matter questioned an increase applicable to Tennessee because it was unrelated to the producer's costs, the Commission did not disturb the 21.3 cent price until completion of the area rate proceedings relied upon in Opinion 470 setting the 18.5 cent rate. Phillips Petroleum Co., 34 F.P.C. 486, 491 (1965); Union Texas Petroleum, 32 F.P.C. 254 (1964)
 
 
 [6]
 Pan American Petroleum Corp., 32 F.P.C. 966 (1964), cited by Jupiter, gives no support to deference to a state court adjudication of the lawfulness of a filed rate for natural gas. There the Commission merely awaited a state court interpretation of a state school tax which had a bearing on contractual issues before the Commission. The Commission's rejection of Jupiter's Mobile attack on a filed rate for jurisdictional services was, moreover, fully consistent with leaving it to the Cook County court to decide whether Jupiter has an equitable claim to reformation of its contracts to recover compensation for non-jurisdictional services
 
 
 [7]
 In this case, for example, the Commission agreed to a settlement rate of 1 cent per Mcf for Jupiter's transportation of gas. Since the liquid condensate portion of the gas stream is estimated at 1.5 to 5% Of the total gas stream, it is evident that the cost of liquid transport is comparatively insubstantial. The examiner's findings as to the costs of Jupiter's service confirm this conclusion. Jupiter Corp., 35 F.P.C. 1091 (1966)
 
 
 [8]
 The Commission's assertion of jurisdiction to regulate the rates for transport of liquid condensates also applies to the Jupiter-Union controversy, and is contested by Jupiter as an intervenor in the Union case. See part II C, supra
 
 
 [9]
 Union's letter to the Commission, dated October 18, 1967, concluded with the statement that 'Union respectfully urges that the Commission schedule its hearings in the captioned proceedings at the earliest possible date due to the growing procedural complexities of these complicated, multi-party proceedings, and the unabated inequities inherent in further delay thereof.'
 
 
 [10]
 The Commission's awareness of the fact that transportation of condensates is not a costly service and is often performed by pipelines without charge underlies its Notice of Proposed Statement of General Policy, regarding pipeline costs allocable to the transportation of liquids and liquefiable hydrocarbons. See 33 Fed.Reg. at 2860