**WASHINGTON GAS LIGHT
COMPANY, Petitioner,**

**v.**

**PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,**

**Office of People's Counsel of the District
of Columbia, Intervenor.**

**OFFICE OF PEOPLE'S COUNSEL OF
the DISTRICT OF COLUMBIA,
Petitioner,**

**v.**

**PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,**

**Washington Gas Light Company,
Intervenor.**

Nos. 81–229, 81–232.

District of Columbia Court of Appeals.

Argued Sept. 24, 1981.

Decided Oct. 29, 1982.

Telemac N. Chryssikos, with whom Lewis Carroll and Monte R. Edwards, Washington, D.C., were on briefs, for petitioner in No. 81–229 and intervenor in No. 81–232.

Lloyd N. Moore, Jr., Gen. Counsel, Washington, D.C., for respondent.

Elizabeth A. Noel, Deputy People's Counsel, with whom Brian J.H. Lederer, People's Counsel, Washington, D.C., was on briefs, for intervenor in No. 81–229 and petitioner in No. 81–232.

James M. Broadstone, Christopher T. Boland, Washington, D.C., Peter C. Lesch, and Steve Stojic filed an amicus curiae brief on behalf of Gas Research Institute.

Before KELLY, HARRIS * and BELSON, Associate Judges.

BELSON, Associate Judge:

Petitioner, Washington Gas Light Company (WGL or Company) sought a rate increase of $17.8 million. Cross petitioner, Office of People's Counsel (OPC) generally opposed it. On November 10, 1980 the Public Service Commission of the District of Columbia (PSC or Commission) awarded an increase of $11.9 million. Both WGL and OPC were dissatisfied and petitioned this court for redress. We conclude that the PSC made two erroneous rulings unfavorable to WGL, but that the errors were not consequential enough to warrant remand with instructions to grant relief. We also conclude that the Commission failed to explain its reasons for the adoption of a formula used to allocate certain expenses among the three jurisdictions served by WGL, and remand for the necessary explanation.

The ratemaking proceedings commenced on June 29, 1979, upon application by WGL for a permanent increase in its rates and charges for retail gas service within the District of Columbia. Evidentiary hearings began in January, 1980, and concluded in April, 1980. On October 3, 1980, the Commission issued a Proposed Order, which was followed by a Final Order on November 10, 1980, approving a new rate schedule effective as of that date. Applications for reconsideration filed by the parties were denied on December 24, 1980, and these petitions for review followed.

WGL appeals the Commission's disallowance of increased Gas Research Institute expenses approved by the Federal Energy Regulatory Commission (FERC) and the disallowance of market pressure and flotation cost adjustments. OPC appeals the Commission's decisions concerning WGL's cash working capital allowance and the amount of the market re-entry adjustment to WGL's revenue requirement. Both parties appeal the Commission's adoption of the modified "Massachusetts Formula" to allocate a share of administrative and general expenses to District of Columbia operations.[1]

I. SCOPE OF REVIEW

The limited nature of our review of orders of the PSC is defined by D.C.Code 1981, § 43–906 which provides:

[R]eview by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

We have discussed the scope of our review in several opinions.[2] There is no need to repeat here what we have said before. However, one aspect of our review function bears emphasis. In *Federal Power Com-*

---

* *Associate Judge* HARRIS retired from this court effective February 5, 1982, and did not participate in the disposition of this appeal.

1. In addition, both parties reassert their claims of error made in an appeal from a previous rate order. Our decision in *Washington Gas Light Company v. Public Service Commission,* D.C. App., 450 A.2d 1187 (D.C.App.1982), which issued during the pendency of this appeal is dispositive as to those "carry over issues," and we therefore do not address them on this appeal.

2. *See Metropolitan Washington Board of Trade v. Public Service Commission,* D.C.App., 432 A.2d 343, 350–52 (1981); Also illustrative are *Washington Gas Light Company v. Public Service Commission, supra,* at 1192; *People's Counsel v. Public Service Commission,* D.C. App., 399 A.2d 43 (1979); *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 393 A.2d 71, 75 (1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).

*mission v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944), the United States Supreme Court stated:

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

■ . That language has often been quoted, and properly so, to underscore the narrow review powers of the courts in this area. Since our review power over the PSC is comparable to the authority vested in the federal courts to review Federal Energy Regulatory Commission orders, the language is applicable here. *Washington Public Interest Organization v. Public Service Commission,* D.C.App., 393 A.2d 71, 75 (1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Yet the language is somewhat broad, especially in its emphasis on the end result. Obviously, it does not mean that the courts are not to review at all the methods by which the agency arrives at its result. The United States Supreme Court has recognized the regulatory commission's duty to indicate "fully and carefully the methods by which, and the purpose for which it has chosen to act." *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). Some elaboration is required, therefore, in order to apply the language in *Hope* to a case like the one before us.

That elaboration has been forthcoming in cases such as *Washington Public Interest Organization,* and *Mississippi River Fuel Corp. v. Federal Power Commission,* 82 U.S. App.D.C. 208, 163 F.2d 433 (1947). In the former, Judge Ferren wrote for this court:

While it is true that a regulatory commission cannot be faulted for its methodology if the "total effect of the rate order cannot be said to be unjust and unreasonable," *Federal Power Comm'n v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 288, it is also true that the

methodology must be disclosed for the bearing it may have on that overall judgment. Absent precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable. [*Washington Public Interest Organization v. Public Service Commission, supra* at 76–77.]

Earlier in *Mississippi River Fuel Corp., supra,* Judge Prettyman had written:

... The discretion which must be exercised is that of the Commission. Congress has confided that function to it. At the same time, Congress has forbidden arbitrary actions and has imposed upon the courts a duty of review in that respect. Arbitrary action, if it means anything, means action not based on facts or reason. The discretion and judgment confided in the Commission must be exercised upon facts and for reason. The duty to review imposed upon the courts requires that the facts be found and the reasons stated. Otherwise, the courts cannot determine whether a given action is or is not arbitrary.

The Congressional provisions extend to complicated, difficult matters as well as to simple questions. The courts cannot evade their responsibility merely because the subject matter is obscure. And neither can they be required to probe the minds of the agency for unfound facts or unexpressed reasons. The coordination of the two functions of administrative discretion and judicial review requires that the facts upon which the discretion is exercised, and the reasons, be clearly and completely stated. When the matter is complicated, the necessity is greater. [*Id.* at 214, 163 F.2d at 439 (footnotes omitted).]

■ Where the PSC has accompanied its ruling with the required full and careful explanation, that ruling is entitled to great deference. In *Metropolitan Washington Board of Trade v. Public Service Commission,* D.C.App., 432 A.2d 343, 352 (1981), Judge Gallagher stated for this court:

Once the Commission has satisfied this initial burden and has issued a decision, however, the burden of petitioner on appeal to demonstrate reversible error is considerable. More than a difference of opinion with the Commission must be asserted, for "[t]he court's responsibility is not to supplant the Commission's balance of [the relevant public] interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Id.* Petitioner therefore must establish "clearly and convincingly a fatal flaw in the action taken . . . ." [*Quoting Goodman v. Public Service Commission,* D.C.App., 309 A.2d 97 at 101 (1973).]

In reviewing the actions of the PSC which are the subjects of the challenges before us, we bear in mind both the deference to be paid the agency's authority and expert judgment and our responsibility to see to it that we have before us the full and careful explanation of the basis for agency action necessary to permit us to carry out the review function demanded by statute and precedent.

We will first address contentions which relate to rate base, and then proceed to issues relating to rate of return, revenues, and expenses.

## II. Cash Working Capital Allowance

OPC asserts that the Commission erred in that the cash working capital allowance it awarded WGL was excessive. Cash working capital allowance is defined as "an amount which the company (investors) must supply from its *own funds* for the purpose of enabling it to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues." *People's Counsel v. Public Service Commission,* D.C.App., 399 A.2d 43, 46 (1979) (citation omitted) (emphasis in original). Since investors are entitled to a return on these advances, a cash working capital allowance is included in the rate base.

WGL requested a cash working capital allowance of $6,084,750. OPC recommended an allowance of negative $537,000. The Commission denied WGL's request for inclusion of compensating bank balances in the allowance, but otherwise approved WGL's request and awarded the company a cash working capital allowance of $5,453,-000. Although the company requested a higher amount, it does not appeal this portion of the Commission's order. OPC appeals the amount of the cash working capital allowance on five grounds.

■ As we noted earlier, the scope of our review is narrow. *Id.* at 45. Initially, the utility has the burden of proving its need for cash working capital. *Id.* at 47. Once the utility has borne this burden, however, and the Commission has determined the amount needed, we may not set aside the amount authorized by the Commission absent an abuse of discretion. *Id.* With these precepts in mind, we proceed to an analysis of the particular objections by the OPC to the amount of cash working capital allowance authorized by the Commission.

### A. Incremental Income Taxes

■ OPC contends that the cash working capital allowance should have been reduced by the amount of the incremental income taxes associated with the increased revenues from the rate increase. The Commission, however, rejected such an adjustment, noting that additional taxes would have "no effect on the computed expense lag." The Company used a lead-lag study,[3] based upon test period experience data, to calculate the cash working capital allowance. In the lead-lag study relied upon by the Company, dollar day lead or lag times were assigned to income tax payments and, thus, the incremental tax payments were taken into account in the Company's calculations. In

---

3. In a lead-lag study, the average dollar day lag in the receipt of revenues and the average dollar day lead in the payment of expenses are computed. From this, a composite expense lag is calculated. This composite expense lag is multiplied by the average daily cash requirement to determine the cash working capital allowance.

choosing to credit the Company's cash working capital allowance calculation, the Commission implicitly took into consideration the fact that actual expenses and actual revenues in the utility's actual year may vary from those in the test year used in the study; this, however, should have no effect on the calculated expense lag. We defer to the Commission's use of a lead-lag methodology in calculating cash working capital allowance and, consequently, conclude that the Commission did not err in refusing to reduce the cash working capital allowance by the amount of the incremental income taxes.

### B. Gross Receipts Tax

D.C.Code 1981, § 47–2501 provides that each gas company must make an affidavit on or before the 1st day of August each year as to the amount of its ... gross earnings or gross receipts, as the case may be, for the preceding year ending the 30th day of June, and each gas company ... shall pay to the Collector of Taxes of the District of Columbia per annum 6 per centum on such gross receipts....

■ OPC asserts that the gross receipts taxes are paid after the money for these taxes is collected from the customers and, consequently, the cash working capital allowance should be reduced a corresponding amount. The Commission found no merit in this argument. It concluded that although the tax liability was calculated on the previous year's gross receipts, the taxes were actually paid in three advance installments. After examining the record, we conclude that there is sufficient evidence to support the Commission's determination that the gross receipts taxes were prepaid and, consequently, should not be deducted from the cash working capital allowance.

### C. Levelized Billing Plan

■ OPC also argues that WGL's use of a levelized billing plan reduces its need for cash working capital. The Commission, noting that WGL's estimate of the net expense lag was actually too low, found that OPC's proposed adjustment was not con-vincing in light of the other evidence introduced. Again, we find sufficient evidence in the record to support this conclusion.

### D. Jurisdictional Computation

■ The Commission agreed with OPC's position that the cash working capital allowance should be calculated on a jurisdictional rather than a systemwide basis. However, in order to give WGL sufficient notice of the change, the Commission deferred implementation of the change until the next rate proceeding. OPC contends that the Commission abused its discretion in postponing the implementation of the jurisdictional computation. Finding no such abuse, we defer to the Commission's determination.

### E. Accrued Interest

Finally, OPC asserts that the cash working capital allowance should be reduced by the amount of accrued interest owed to bondholders. In *People's Counsel v. Public Service Commission, supra* at 49–50, we directed the Commission's attention to *Re Iowa Power and Light Co.,* 6 P.U.R.4th 446 (1974) (deducting the amount of accrued interest on long-term debt from the cash working capital allowance), for the Commission's "serious consideration in formulating the rate base in future proceedings." *People's Counsel v. Public Service Commission, supra* at 50. However, we declined to remand for further consideration the Public Service Commission's decision not to reduce WGL's cash working capital allowance by the amount of the accrued interest because "the matter [was] of insufficient magnitude to merit the unraveling of a complex rate structure solely on this account." *Id.*

■ In the proceedings being reviewed, the Commission has again declined to reduce the cash working capital allowance by the amount of the accrued interest on bonds, stating that it was "no more disposed to adopt such an argument than in the past" and citing only *People's Counsel v. Public Service Commission, supra,* and its order No. 7135 in *Re Potomac Electric Pow-*

er Co., 36 P.U.R.4th 139 (1980). We note that in an order not cited, Re Potomac Electric Power Co., 29 P.U.R.4th 517, 555–57 (1979), the Commission gave several reasons for its decision to include only cash operating expenses in the calculation of the cash working capital allowance. Essentially, the Commission concluded that interest expense is not an operating or "above the line" expense and it should not be selectively included in the cash working capital allowance, just as other "below the line" or noncash expenses are not so included. Since the Commission has clearly articulated a basis for its treatment of accrued interest, we refer to its ruling.

In light of our analyses of the five objections OPC interposed to the Commission's determination of cash working capital allowance, we decline to overturn the Commission's ruling in that regard.

### III. MARKET PRESSURE AND FLOTATION COSTS ADJUSTMENT

■ WGL asserts that the Commission erred in disallowing its request for an adjustment to its rate of return for market pressure and flotation costs associated with the issuance of new stock. Market pressure refers to the depression in the price of stock which occurs when additional stock is issued; flotation costs are costs incurred in issuing the additional stock, for example, underwriting costs, attorneys' and accountants' fees, etc. When new stock is issued by a utility, these costs properly are considered in calculating the rate of return.

■ Among the factors a regulatory agency must consider in setting a utility's rate of return is the return an investor must receive in order to enable the utility to compete successfully for capital. The regulatory agency is obliged to allow a rate of return to equity holders that is "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital." Federal Power Commission v. Hope Natural Gas

Co., supra at 603. See also Bluefield Water Works & Improvement Co. v. Public Service Commission of the State of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

The rate of return required to attract capital investment is referred to as the "cost of equity." The Commission calculated WGL's cost of equity by the discounted cash flow (DCF) method. That method takes into account an investor's anticipated income from dividends and capital gain upon eventual sale of the stock in order to arrive at an estimated rate of return which the investor must receive in order to induce him to invest in the utility stock. The cost of equity arrived at by the DCF method is referred to as the "bare-bones" cost of equity, i.e., the cost of equity determined solely on the basis of current dividend returns and anticipated growth, without adjustment for factors such as the issuance of additional stock.

In the instant case, the Commission set the cost of equity to WGL as a return on equity of 13.25%.[4] WGL does not appeal this determination of the "bare-bones" cost of equity, but appeals the Commission's refusal to adjust the rate of return upward to reflect market pressure and flotation costs expected to result from WGL's anticipated issuance of additional common stock in 1981. The Commission concedes that the rate of return allowed to equity holders should include an allowance for market pressure and flotation costs when additional stock is issued, but justifies its refusal to grant the allowance here on the grounds that WGL did not present sufficient evidence that it would issue additional stock in the near future to warrant granting the allowance.[5]

The record reflects that WGL Chief Financial Officer, Patrick J. Maher, in testimony filed with the Commission on March 31, 1980, stated that WGL planned a public offering of common stock in 1981, and that on April 8, 1980, Mr. Maher testified that a

---

4. Commission's Final Order No. 7209, ordering paragraph B, at 2, Nov. 10, 1980.

5. Commission's Proposed Order No. 7193, ordering paragraph D, at 32, Oct. 3, 1980.

five-year plan to issue stock, including a projected issuance of fifteen to twenty million dollars worth of common stock in 1981, had been approved by the WGL Board of Directors in March, 1980.

In its Proposed Order, the Commission noted that Mr. Maher was "probably in the best position to determine [WGL's] need for new equity," and that he "indicated quite strongly" that approximately fifteen to twenty million dollars in new equity would be needed in 1981. Yet, the Commission concluded that the evidence submitted to it indicated "little more than a possibility" of a new issuance of common stock.[6] We disagree. The evidence before the Commission in the form of testimony of the company's Chief Financial Officer was that the Board of Directors had approved the issuance of common stock having a value of approximately fifteen to twenty million dollars. As the Commission itself concedes, WGL's failure to announce a more specific plan regarding the issuance was "not unusual since such information commonly is released only shortly in advance [of actual issuance]."[7]

We conclude that the evidence concerning WGL's projected issuance of common stock in 1981 was such that it was unreasonable for the Commission to deny an adjustment to the rate of return to reflect the market pressure and flotation costs associated with the issuance.[8] We hold, therefore, that the Commission's refusal to grant the adjustment was error.

## IV. MARKET RE-ENTRY

OPC contends that the Commission's decision to reduce WGL's revenue requirement by only $600,000 by reason of market re-entry was not supported by substantial evidence. The term market re-entry as used here refers to the anticipated growth in

sales expected to be realized by WGL as a result of relaxation of restrictions on the Company's extension of its service to new customers. The restrictions were imposed by the Commission in 1972 due to a shortage of natural gas. As the availability of gas increased, the restrictions were eased and, in 1978, the Commission approved a plan for gradual increase in the number of WGL customers.

Additional sales by WGL under the program began in approximately October, 1979, and were considered in the calculation of the Company's cost-of-service for 1979. In addition, the Commission reduced the Company's annual revenue requirement by $600,000 in consideration of prospective sales increases. WGL does not appeal the Commission's order with respect to the adjustment to the revenue requirement. OPC, however, contends that the Commission's decision is unsupported by substantial record evidence.

In proceedings before the Commission, WGL contended that no revenue adjustment was necessary to account for market re-entry. At the same time the Company projected an increase in future sales which the Commission calculated would have the net effect of reducing the revenue requirement by $423,891 annually. Commission staff estimated a gross increase in Company revenues of $5,896,000 annually resulting in a net reduction to the revenue requirement of approximately $795,000 annually. OPC projected a $6,444,000 annual increase in gross revenues with a resultant reduction to revenue requirement of $927,872.

The requirement of the District of Columbia Administrative Procedure Act, D.C.Code 1981, § 1–1509(e), that agency decisions be accompanied by findings of fact and supported by substantial evidence im-

6. *Id.*

7. *Id.*

8. In our review of the evidence before the Board on this issue, we did not consider Mr. Maher's reported statement to the Maryland Public Service Commission, as represented to

the Commission by WGL in its Exceptions to the Commission's Proposed Order, nor did we consider WGL's application to the Commission in March, 1981, for authorization to issue new common stock; the statement and application were not properly before the Board as evidence in the proceedings under review here.

poses upon the agency the duty to make findings of basic facts upon which the agency decision rests. Put another way, the agency must "show on what it relied in reaching its decision." *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission,* D.C.App., 402 A.2d 36, 42 (1979), *quoting Miller v. Commission on Human Rights,* D.C.App., 339 A.2d 715, 719 (1975). Moreover, the agency decision must rationally follow from the facts. *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Commission, supra* at 41.

In its Proposed Order, the Commission set forth findings of fact and cited to record evidence in support of its determination that the estimates of future sales provided by the parties were deficient.[9] The Commission's stated reasons for ordering a $600,000 reduction to WGL's revenue requirement were that the net effect of the sales growth forecast by WGL was "too conservative;" the estimates by staff and OPC might prove to be "unrealistically high;" an increase in sales was "a virtual certainty," and the rate of growth in sales was "slower than anticipated." The Commission made no express findings, however, to underpin the revenue adjustment it ultimately ordered.

▬ Thus, there is some merit in OPC's contention that the Commission's conclusion is not properly supported by its findings. We must recognize, at the same time, that implicit in its determination of a revenue requirement reduction is a PSC estimate of the amount of sales growth WGL will experience due to its re-entry into the market. The record provided the Commission with sufficient evidence on the market re-entry issue to provide an adequate basis for decision, although, necessarily, the evidence consisted in large part of estimates and projections. In view of the Commission's implicit finding as to sales growth, we decline to set aside its decision·in this regard.

9. Order No. 7193 at 35–40.

10. Commission Order 7209, ordering paragraph E at 4 (November 10, 1980).

## V.  GAS RESEARCH INSTITUTE EXPENSES

WGL challenges the Commission's refusal to allow the company to recover, as operating costs, projected increases in the wholesale cost of natural gas attributable to increases in Gas Research Institute surcharges effective January 1, 1981. The Commission limited the Company's recovery to the "current amount" of Gas Research Institute surcharges, *i.e.,* the amount paid by WGL in the test year, 1979, approximately $93,000.[10]

The Gas Research Institute (GRI) is a non-profit research and development corporation supported by the natural gas industry. Its members include interstate pipeline and distribution companies. GRI's costs are assessed its members who, in turn, incorporate the cost of their contributions into the rates they charge their retail utility customers such as WGL. Before the interstate wholesalers can raise their rates to reflect ·increases in their assessed contributions, they must receive approval from FERC.[11]

The Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* (1976), authorizes FERC to regulate the interstate transportation and sale of natural gas, including approving rates charged in interstate sales. So that wholesale companies need not petition FERC for permission to raise their rates whenever their assessed contributions are raised, FERC allows research and development corporations such as GRI to submit to FERC for approval a proposed budget, including contributions assessments. FERC approval of the research and development organization's plan constitutes approval of the member companies' contributions to the organization, including the wholesale rate increase reflecting the higher assessments.

▬ Since a wholesaler's rates reflect contributions to GRI, any increase in GRI costs to the wholesaler results in a higher

11. The FERC was created pursuant to 42 U.S.C. §§ 7101 *et seq.* (Supp. II 1978) and Executive Order No. 12009, 42 Fed.Reg. 46267 (1977), and as of October 1, 1977, assumed the functions of the Federal Power Commission (FPC).

purchase cost of gas to the local utility. The local utility's purchase cost is an operating expense and is properly included in the cost of service.

WGL purchases natural gas from two wholesale companies, Columbia Gas Transmission Corporation and Transcontinental Gas Pipeline Corporation. Both wholesalers are members of GRI. In September 1980, FERC approved an increase in GRI assessments from .48 per Mcf.[12] to .56 cents per Mcf. effective January 1, 1981.[13] In the ratemaking proceeding under review here, WGL requested that it be allowed to raise its rates to reflect the correspondingly increased wholesale costs resulting from the increased GRI surcharges approved by FERC.[14] The Commission granted WGL permission to charge rates reflecting the Company's GRI contribution as of October, 1979, but refused to allow an adjustment to reflect the increase effective January, 1981. The Commission justified its decision on the grounds that the FERC approved increase was not a "known and measurable expense," and that few benefits would accrue to District of Columbia ratepayers as a result of GRI activities.

The Commission agrees that the entire wholesale cost of gas is recoverable by WGL as a cost of service. It is the Commission's position, however, that the authority of FERC to approve GRI charges to member companies was in question at the time of the present ratemaking proceeding, and thus that portion of wholesale costs attributable to GRI charges was not a measurable and certain expense. The Commission further contends that, even if FERC is found to have authority to approve the GRI increase, the Commission acted properly in denying the GRI charges and that the correct procedure was for the Company to return to the Commission and ask for a rate increase when the issue of FERC jurisdiction was settled.

At the time the Commission issued its order, a suit was pending in the United States Court of Appeals for the District of Columbia Circuit challenging FERC's jurisdiction to approve GRI charges to member companies. Subsequent to the Commission's order in the present case, the court ruled that FERC has jurisdiction to approve GRI's program and budget and to rule on applications for rate increases submitted by GRI on behalf of the jurisdictional members. *Public Utilities Commission of the State of Colorado v. Federal Energy Regulatory Commission,* 660 F.2d 821, 825 (D.C. Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982).[15]

The issue before us is whether the Commission erred in disallowing the increased GRI charges as reasonable operating expenses on the grounds that the above appeal was pending at the time of the Commission's decision. We hold that it did. It is well settled that the Natural Gas Act provides for exclusive federal regulation of interstate wholesales of natural gas. *See Northern Natural Gas Company v. State Corporation Commission of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963); *Illinois Natural Gas Company v. Central Illinois Public Service Commission,* 314 U.S.

12. One Mcf. is 1,000 cubic feet.

13. FERC Opinion No. 96, Ordering Paragraph (B) at 18 (Sept. 30, 1980).

14. WGL estimated its yearly contributions to GRI from 1980 to 1984 inclusive, to be: 1980— $127,109; 1981—$175,665; 1982—$213,930; 1983—$246,846; 1984—$254,162.

15. We agree with OPC that nothing in the holding of the case can be read as extending FERC's jurisdiction to the issue of whether increased wholesale costs shall be passed through to retail customers by the local utility. The determination of the extent to which wholesale costs should be reflected in local utility rates lies exclusively with local utility commissions. *See Narragansett Electric Co. v. Burke,* 381 A.2d 1358, 1363 (R.I.1977), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978).

The Commission's refusal to allow increased GRI charges to be reflected in retail rates in the instant case, however, was based upon the Commission's erroneous conclusion that the increase in wholesale costs was not a just and reasonable operating expense, rather than upon a determination that the expense should not be passed through to retail customers.

498, 62 S.Ct. 384, 86 L.Ed. 371 (1942). State and local commissions have no authority, therefore, to inquire into the reasonableness of wholesale rates, but must allow them as reasonable operating expenses. *See, e.g., Citizens Gas Users Association v. Public Utilities Commission of Ohio,* 165 Ohio St. 536, 138 N.E.2d 383 (1956); *City of Chicago v. Illinois Commerce Commission,* 13 Ill.2d 607, 150 N.E.2d 776 (1958); *United Gas Corp. v. Mississippi Public Service Commission,* 240 Miss. 405, 127 So.2d 404 (1961).[16]

In the instant case, the Commission chose to disregard a final FERC order approving wholesale rates on the ground that FERC's jurisdiction had been challenged by another utility commission in a petition for judicial review of the order. The Commission ignored the fact that in the absence of a stay the FERC order, as a final agency order, was fully in effect during proceedings for review. *Jupiter Corp. v. Federal Power Commission,* 137 U.S.App.D.C. 295, 303, 424 F.2d 783, 791 (1969), *cert. denied,* 397 U.S. 937, 90 S.Ct. 944, 25 L.Ed.2d 118 (1970); *Ecee, Inc. v. Federal Power Commission,* 526 F.2d 1270, 1274 (5th Cir.), *cert. denied,* 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976).

We hold that the Commission had no authority to disallow as a reasonable operating expense the wholesale purchase cost of natural gas approved by FERC, including that portion of wholesale costs attributable to GRI surcharges to become effective January 1, 1981. Because we hold that the Commission had no jurisdiction to rule on the reasonableness of such surcharges, we need not reach, and the Commission was unauthorized to consider, the issue whether the GRI charges benefit the District of Columbia ratepayers.

Finally, we decline PSC's invitation to rule that the United States Court of Appeals erred in *Colorado* and to hold that FERC was without jurisdiction to approve GRI expenses as a part of the wholesale

rate paid by gas retail companies including WGL. Review of the rulings of FERC is vested by statute in the United States Court of Appeals, not this court. *See* 15 U.S.C. § 717r(b) (1976).

VI. MODIFIED MASSACHUSETTS FORMULA

WGL serves consumers in the District of Columbia, Maryland and Virginia. Both WGL and OPC assert that the Commission erred in adopting a new formula for allocating to the District of Columbia its fair share of administrative and general [A & G] expenses.

In Formal Case No. 686, the Commission directed WGL to:

> [E]ither reflect A & G expenses allocation solely according to a modified "Massachusetts Formula" or if it nonetheless still advocate[d] a different approach, present a complete alternate cost of service which reflects allocation under modified "Massachusetts Formula." [Commission Order No. 6051, ordering paragraph C at 76.]

The Massachusetts Formula, originally used by the Massachusetts Department of Revenue to determine the amount of tax owed to Massachusetts by corporations doing some of their business in the state, allocates administrative and general expenses by employing an average of the percentage of property, wages and (twice the percentage of) sales related to the jurisdiction. Formerly, the Commission had permitted WGL to allocate administrative expenses not directly assignable to a jurisdiction on the basis of a factor, expressed in terms of labor expenses, which was a composite of a number of factors including therm sales, plant, and labor. At the rate proceeding below, WGL continued to use its existing method for allocating A & G expenses and presented a comparative statement showing the revenue requirement using the "Massachusetts Formula" for allocating A & G expenses. OPC advocated that all A & G expenses—both labor-related

---

16. The highest courts of at least two jurisdictions have held that state utility commissions are not free to disallow, as operating expenses, wholesale rates filed with, but not yet approved by, the FERC. *See Narragansett Electric Co. v. Burke, supra; United Gas Corp. v. Mississippi Public Service Comm'n., supra.*

and non-labor-related—be allocated according to the modified Massachusetts Formula and that an adjustment of $1.5 million be made to the revenue requirement.

In its order the Commission purported to adopt a modified Massachusetts Formula, and stated that it allocated labor-related A & G expenses in the same manner as all A & G expenses had been allocated in the past and non-labor-related expenses on the basis of a simple average of the jurisdiction's share of plant, sales and labor.[17] The Commission reduced WGL's allocation of A & G expenses to the District of Columbia by $856,000. WGL contends that the Commission's decision to adopt the modified Massachusetts Formula for allocating A & G expenses is not supported by substantial evidence, lacks the requisite findings of fact and jeopardizes the company's ability to recover its cost of service in the Washington metropolitan area. OPC supports the use of the modified Massachusetts Formula, but argues that the record does not support the amount of the adjustment made by the Commission.

As we observed in the discussion above of the scope of our review, "[b]efore meaningful judicial review to determine the reasonableness of a Commission decision is possible, the Commission, of course, must satisfy its own burden: to base its decision on sufficient evidence and to explain its actions 'fully and carefully.'" *Metropolitan Washington Board of Trade v. Public Service Commission, supra* at 351; *See Washington Public Interest Organization v. Public Service Commission, supra* at 75–78; *Mississippi River Fuel Corp. v. Federal Power Commission, supra* 82 U.S.App.D.C. at 224, 163 F.2d at 433. Although our review function is narrow, before we can give deference to the Commission's choice of

methodology, that methodology must be fully disclosed. *Washington Public Interest Organization v. Public Service Commission, supra* at 76–77.

In its order, the Commission failed to explain the reasons for its choice of the so-called Modified Massachusetts Formula, the method it used to employ that formula, and the calculation of the amount of the adjustment to the District's share of A & G expenses.[18] In the absence of such an explanation, it is impossible for us to determine whether the Commission's choice of the Modified Massachusetts Formula is reasonable. Therefore, we must remand the case to the Commission for an explanation of precisely what formula was used, why that formula was chosen, and how the amount of the adjustment was computed. *See Washington Public Interest Organization v. Public Service Commission, supra* at 78; *Mississippi River Fuel Corp. v. Federal Power Commission, supra* 82 U.S.App.D.C. at 227, 163 F.2d at 436.

## VII. REMEDY

We reverse the Commission's refusal to adjust the rate of return to reflect market pressure and flotation costs associated with the issuance of common stock and its disallowance of the projected increases in GRI surcharges as operating expenses. In light of the relatively small amounts of revenue involved, *see People's Counsel v. Public Service Commission, supra* at 50, and the policy against retroactive ratemaking, *see Bebchick v. Washington Metropolitan Area Transit Commission,* 158 U.S.App.D.C. 79, 85, 485 F.2d 858, 864 (1973); *Payne v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 321, 329–31, 415 F.2d 901, 909–11 (1968), however, we do

---

17. OPC questions the Commission's actual application of the Modified Massachusetts Formula. Although the Commission gave a general description of its concept of the Modified Massachusetts Formula in its order, it failed to elaborate on its methodology, *i.e.,* disclosure of the percentages of revenue, plant and labor allocated to each jurisdiction, and a breakdown of the administrative and general expenses sub-accounts into labor and non-labor-related expenses.

18. From its order, it is impossible for us to determine which party's exhibits and calculations, if any, the Commission credited and relied upon in adopting its version of the Modified Massachusetts Formula.

not remand these aspects of the order for recalculation of the revenue requirement.[19]

We remand the Commission's adoption of the Modified Massachusetts Formula for an explanation of its reasons for choosing this formula. In this regard, we note that we have

not reversed the conclusions of the Commission, except in the procedural sense necessary to a remand. [We have] remanded the case for clarification where clarity is not present, and for completion where incompleteness now exists. When the findings and conclusions are complete and clear, the court will then, if appropriate proceedings are brought, consider whether the ultimate rulings of the Commission are within the permissible bounds of its power. [*Mississippi River Fuel Corp. v. Federal Power Commission, supra* 82 U.S.App.D.C. at 227, 163 F.2d at 452.]

*See also Washington Public Interest Organization v. Public Service Commission, supra.*

In all other respects, the order under review is affirmed.

*Affirmed in part; reversed in part; remanded for further proceedings in part.*

---

**19.** We observe that, in view of our rulings herein, there is no aspect of the GRI or market pressure-flotation cost issues that will require PSC consideration upon our remand on the issue of allocation of A & G expenses.