PEOPLE'S COUNSEL OF the DISTRICT OF COLUMBIA, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent.

Potomac Electric Power Company, Washington Metropolitan Area Transit Authority, Intervenors.

No. 82–483.

District of Columbia Court of Appeals.

Argued Sept. 22, 1982.

Decided April 4, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc June 16, 1983.

Jay D. Pedelty, Washington, D.C., with whom John T. Schell, Brian Lederer and Elizabeth A. Noel, Washington, D.C., were on brief, for petitioner.

Lloyd N. Moore, Jr., Washington, D.C., with whom Michael D. Newsom and Michael E. Geltner, Washington, D.C., were on brief, for respondent.

William Dana Shapiro, Washington, D.C., with whom Edward A. Caine and Betty Y.

Cauley, Washington, D.C., were on brief, for intervenor PEPCO.

Onkar N. Sharma, Washington, D.C., for intervenor WMATA.

Before NEWMAN, Chief Judge, and KERN, Associate Judge, and GREENE *, Associate Judge, Superior Court of the District of Columbia.

KERN, Associate Judge:

Petitioner, People's Counsel (OPC), seeks review of a final order and a denial of reconsideration by respondent, the Public Service Commission (PSC or the Commission), in its Formal Case No. 748. Potomac Electric Power Company (PEPCO) has intervened in support of the orders. Washington Metropolitan Area Transit Authority (WMATA) intervened opposing them insofar as they have a disproportionate effect on it.

On September 17, 1980, PEPCO filed a request for a permanent rate increase.[1] After some disagreement as to what test year [2] should be used, PEPCO withdrew its original application and filed a new one on January 8, 1981. A test year of calendar 1980 was approved by the Commission and PEPCO's revenue increase request based on it was $37.1 million. Following evidentiary hearings and briefings by the parties, the Commission, on December 23, 1981, announced its decision and on December 30, 1981, filed Order No. 7457, with one commissioner dissenting in part, granting a rate increase of $23,289,000. OPC and WMATA, among others, applied for reconsideration. WMATA's request was denied on February 3, 1982, and the requests of OPC and other parties were denied on March 1, 1982. On March 8, the Commission filed Order No. 7505 setting out the reasons for these denials.

People's Counsel appeals the Commission's computation of PEPCO's cash working capital allowance and challenges the PSC's approval of tax normalization treatment for certain investment tax credits, for construction overhead costs, and for local corporate taxes and cuts in federal corporate taxes. WMATA challenges a disproportionate rate increase granted PEPCO which equalized the rate of return charged to the Metro class with the class of customers paying the highest rates. Both OPC and WMATA also raise challenges to the procedures used by the PSC in approving PEPCO's tariff compliance filings. OPC asserts that these filings should have been served on the parties prior to approval to allow comment. WMATA argues that the procedures did not constitute adequate record support for the filings, thus precluding meaningful review and violating WMATA's constitutional due process rights.

We conclude that the PSC has met its burden of supporting all of its conclusions

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1981).

1. As noted in I A. Priest, *Principles of Public Utility Regulation,* 45 (1969), making a decision on an application for a permanent rate increase "requires four basic determinations":

    The orthodox making of public utility rates requires four basic determinations: (1) what are the enterprise's *gross utility revenues* under the rate structure examined; (2) what are its *operating expenses,* including maintenance, depreciation and all taxes, appropriately incurred to produce those gross revenues; (3) what utility properly provides the service for which rates are charged and thus represents the base (*rate base*) on which a return should be earned; and (4) what percentage figure (*rate of return*) should be applied to the rate base in order to establish the *return* (wages of capital) to which investors in the utility enterprise are reasonably entitled. [Emphasis in original; footnote omitted.]

2. The test year concept also is explained in Priest, *supra* note 1, at 45:

    In substantially all formal rate proceedings, relevant data covering a "test period" of one year are examined. If that period comprises the most recent twelve months for which information is available, gross revenues will be taken directly from the company's books. If six months of actual and six months of projected earnings are combined for test purposes, the figures of gross revenues should be substantially accurate. They will, in any event, be subject to precise revision before the regulatory agency makes its findings.

with substantial evidence in the record and, further, that any factual errors are not of sufficient magnitude to require reconsideration of any part of this decision. We therefore affirm the Commission's decisions on the issues of the cash working capital allowance, tax normalization, and the WMATA rate increase, and we approve of the PSC's handling of the compliance filing stage of these ratemaking proceedings.

### I. Scope of Review

■ The scope of this court's review of the orders of the PSC is defined by D.C. Code § 43–906 (1981), which states:

> [R]eview by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

This provision has been interpreted frequently,[3] and no doubt remains that this court is "obliged to examine the record to determine whether the Commission has acted arbitrarily, and whether each component of the Commission order is supported by substantial evidence." *Washington Gas Light Co. v. PSC,* 450 A.2d 1187, 1193 (1982) (WGL I). The Commission feels, however, that confusion still lingers with respect to the "end result" language of *Federal Power Commission v. Hope Natural Gas Co.,*[4] and how this affects the PSC's burden of rationalizing its ratemaking decisions. Because these issues are central to our disposition of this case, and to our review of ratemaking cases generally, we direct the Commission's attention to Judge Belson's opinion in

**3.** *Washington Gas Light Co. v. PSC,* 452 A.2d 375, at 378–80 (D.C.1982) (WGL II); *Washington Gas Light Co. v. PSC,* 450 A.2d 1187, 1192–94 (D.C.1982) (WGL I); *Metropolitan Washington Board of Trade v. PSC,* 432 A.2d 343, 350–52 (D.C.1981); *People's Counsel v. PSC,* 399 A.2d 43, 45–46 (D.C.1979); *Washington Public Service Organization v. PSC,* 393 A.2d 71, 75 (D.C.1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) (*WPIO v. PSC*).

**4.** At 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944), the Supreme Court stated:

*Washington Gas Light Co. v. PSC,* 452 A.2d 375 (D.C.1982) (WGL II). In that case we recognized that, while this language properly underscores the limited review function of appellate courts in ratemaking cases, it "is somewhat broad, especially in its emphasis on the end result." *Id.* at 379.

We noted our earlier language in *Washington Public Interest Organization v. PSC* (*WPIO v. PSC*), 393 A.2d 71, 76–77 (D.C. 1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979):

> While it is true that the regulatory commission cannot be faulted for its methodology if the "total effect of the rate order cannot be said to be unjust and unreasonable," *Federal Power Commission v. Hope Natural Gas Co.,* it is also true that the methodology must be disclosed for the bearing it may have on that overall judgment. Absent a precise explanation of methodology as applied to the facts of the case, there is no way for a court to tell whether the Commission, however expert, has been arbitrary or unreasonable. [Citation omitted.]

The simple point of this language is that a reviewing court cannot tell if an "end result" is reasonable unless it can examine the steps which led to this result. The statement was made more elaborately in *Goodman v. PSC,* 162 U.S.App.D.C. 74, 497 F.2d 661 (1974):

> In any analysis of whether an end result (*i.e.* the new rate) is not arbitrary, we are aware that since the result is but the "sum of a number of components," each component must be analyzed. *Mississippi*

> It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

Because our review of the PSC is comparable to the review of the Federal Energy Regulatory Commission (successor of the FPC) by federal courts, this language has been frequently and properly noted by this court. *WGL II, supra,* 452 A.2d at 379.

*River Fuel Corp. v. FPC.* [82 U.S.App. D.C. 208, 163 F.2d 433 (1947)] As is pointed out in the *Mississippi River* case, a component analysis was in fact used by Mr. Justice Douglas in the case of *FPC v. Hope Natural Gas Co.,* from which the "end result" language is often drawn. We must ascertain as appellee Pepco agrees, "whether each of the Commission's Order's essential elements is supported by substantial evidence in the record." If each component or element is not arbitrary or capricious, the end result will be a sound one. [*Goodman v. PSC, supra,* 162 U.S.App.D.C. at 79, 497 F.2d at 666, *cited with approval in Watergate Improvement Associates v. PSC,* 326 A.2d 778, 784 (D.C.1974) (citations and footnotes omitted).]

The Commission notes correctly that OPC must make a "convincing showing" of unreasonableness in a rate order to enable this court to set aside that order. *WPIO v. PSC, supra.* It bears re-emphasis, however, that the failure of OPC to carry this burden *does not* mandate affirmance. As a reviewing court we have

a responsibility to hold the Commission accountable—through as many remands as necessary—for satisfying a *burden all its own:* to explain its actions fully and clearly. A utility rate cannot be deemed "reasonable" simply because an expert agency says it is. *Independent of a petitioner's burden* to show convincingly that a Commission-prescribed rate is unreasonable, the Commission . . . has the burden of showing fully and clearly why it has taken the particular ratemaking action. Absent such comprehensive explanation, judicial review of the Commission's substantive decisions cannot be completed and the rate order finally approved—or

set aside. [*WPIO v. PSC, supra,* 393 A.2d at 75 (emphasis added).]

Mindful both of the limited nature of our review of this ratemaking decision and of its requisite scope, we turn to the issues before us. We will address first the cash working capital allowance, then the issues relating to tax normalization. We will proceed to the WMATA rate increase, and, finally, we will turn to the procedures used in the compliance filing stage of these proceedings.

### II.   Cash Working Capital

In Order No. 7457 the PSC granted PEPCO a $17,393,000 cash working capital allowance. The purpose served by this allowance was described in *People's Counsel v. Public Service Commission,* 399 A.2d 43, 46 (D.C.1979).

Utilities often experience cash flow problems because they bill for services after it is rendered. It is recognized that customer payments for services generally are not made to the utility until a portion of the cost incurred in furnishing those services is actually paid by the utility. Included, therefore, in the rate base is an allowance for working capital so that the company can keep itself current in paying costs. Cash-working capital represents an amount which the company (investors) must supply from its *own funds* for the purpose of enabling it to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues. [Emphasis in original; citations omitted.]

OPC does not challenge the propriety of such an allowance. Rather, the People's Counsel objects to the inclusion of accrued interest (on PEPCO bonds) and accrued preferred stock dividends in the rate base [5] as a source of working capital. PEPCO sets aside or "accrues" funds from payments by

---

5.   *See, supra* note 3. This is one of the basic ratemaking concepts:

"Rate base" represents the total investment in, or fair value of, the facilities of a utility employed in providing its service. That figure is multiplied by a percentage, called "rate of return," to arrive at the wages

of capital, or the allowed return, which orthodox regulation gives the utility an opportunity to earn. If, for example, the rate base is $1,000,000 and the rate of return is six per cent, the amount which the utility receives a chance to earn will be $60,000. [A. Priest, *supra* note 1, at 139.]

its customers in order to make periodic interest payments on its bonds and to pay preferred stock dividends. Pending disbursement PEPCO can use these funds to help meet current expenses. Significantly, OPC and the Commission differ as to what should be considered the source of these funds. The PSC agrees with PEPCO that once the money is accrued it belongs to the company's investors and must be included in the rate base to assure them a return.

OPC, on the other hand, argues that it is basically an accounting fiction to say that the funds *belong* to the investors before they receive them and, because the money is supplied by ratepayers, that ratepayers should not have to pay an additional amount for its use prior to disbursement to investors.

OPC made the same argument in *People's Counsel, supra.* There, we directed the attention of the PSC to the opinion of the Iowa State Commerce Commission in *Re Iowa Power and Light Co.,* 6 P.U.R. 4th 446 (1974). The Iowa Commission, faced with the same question, decided that accrued interest would *not be set off against the cash* working capital allowance and, therefore, not included in the rate base. In light of the well reasoned Iowa opinion, the PSC's conclusory statement that the matter was discretionary, and its adherence to the opposite approach, we recommended the PSC's "serious consideration [of the Iowa opinion] in formulating the rate base in future proceedings." *People's Counsel v. PSC, supra,* 399 A.2d at 50.

In *In re Potomac Electric Power Co.,* 29 P.U.R. 4th 517, 556–57 (1979), the PSC considered fully and still declined to adopt the Iowa position. In two ratemaking cases since then, this court has reviewed the PSC's handling of the mandate of *People's Counsel v. PSC,* and has found it satisfactory. *People's Counsel v. Public Service Commission,* 455 A.2d 391, 398–99 (D.C.1982); *WGL II, supra,* 452 A.2d at 381–82. We agree. Given the articulation of a reasoned basis for its treatment of accrued interest

and preferred stock dividends, we defer to the judgment of the Commission.

### III. Tax Normalization

OPC objects that PEPCO has been allowed, without a sufficient showing of necessity, to normalize certain tax benefits. Specifically, the Commission has approved of continued normalization treatment for construction overhead costs, the D.C. Franchise tax, and the reduction from 48% to 46% in the federal corporate taxes; and, reversing its previous position, has adopted normalization for the 4% investment tax credit (ITC) it now receives on construction work in progress (CWIP).

OPC urges that these tax benefits should be "flowed through," in the form of lower rates to ratepayers, as soon as they are realized. This does not occur when normalization is allowed.

> Under normalization, a utility receives the benefit of the tax deferral but charges rates as though the postponed taxes had been paid. The difference between the taxes actually paid and the larger amount charged to ratepayers is ordinarily retained in a "deferred tax" account. Until the deferred taxes fall due, the funds "are available to the company as working capital free of any charges for interest or dividends." [*Public Systems v. Federal Energy Regulatory Commission,* 196 U.S.App.D.C. 66, 69, 606 F.2d 973, 976 (1979), (quoting *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 359 F.2d 318, 327 (5th Cir.), *cert. denied,* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966)).]

OPC argues that normalization creates a windfall to the utility through "phantom taxes" on the taxpayer. To avoid that result, benefits must be flowed through:

> [u]nless tax benefits are passed on to the taxpayer ... the utility will reap a permanent tax saving, since so long as the expenses subject to normalization remain stable or increase, the benefits of postponing present tax liabilities will more than offset previously deferred taxes that currently fall due. This proposition is

strengthened in periods of inflation, when current liabilities will likely exceed previously deferred expenses. [*Public Systems v. FERC, supra,* 196 U.S.App.D.C. at 69, 606 F.2d at 976 (footnotes omitted).]

Given these opposing viewpoints on the question at the center of the debate, we turn to the specifics of the case at hand. The normalization issue reduces to two parts. First, did the PSC, through substantial evidence in the record, have adequate support for its decision to *continue* normalization treatment to the first group of tax benefits? Second, was there a factual error in the PSC's decisional process of sufficient magnitude, timely brought to the attention of the Commission, which mandates reversal of the decision to normalize the 4% ITC?

In addressing the matters which gave rise to the first part of the normalization issue, rather than focusing on the particular benefits involved, PEPCO advanced and the PSC credited more general theories in support of a policy of normalization. (PEPCO Brief at 17–19; PSC Brief at 22–23.) The Commission noted primarily that normalization

(1) prevents a "windfall" to current customers at the expense of later customers who are entitled to their fair share of tax benefits, (2) lowers revenue requirements for the Company over the useful life of the property, and (3) improves the Company's cash flow and thereby reduces external financing requirements. [PSC Formal Case No. 748, Order No. 7457 at 37 n. 14.]

OPC objects that PEPCO demonstrated no need for an improved cash flow and that the interests of the ratepayers, therefore, have been ignored. The Commission, for its part, appears to have been concerned that nothing be done to impair PEPCO's long-term financial stability.

▮ It is clear that the Commission's public service duty is to utilities and their investors as well as to rate-payers.

The rate-making process under the Act, *i.e.,* the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests.... [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. [*Federal Power Commission v. Hope Natural Gas Co., supra,* 320 U.S. at 603, 64 S.Ct. at 288.]

*See also Potomac Electric Power Co. v. Public Service Commission,* 380 A.2d 126, 132 (D.C.1977). In discharging this duty in the present case, the Commission stated:

The majority is impressed with [the Federal Energy Regulatory Commission's] view that tax normalization acts as a "stabilizing force" that "tends to improve a utility's internal cash flow when the need is greatest and to decrease it when the need is less". FERC Order No. 144, *supra,* pp. 86, 82 (46 Fed.Reg. 26628, 26629). We specifically note FERC's finding that "cash flow under tax normalization coincides better with cash needs than under flow-through, since tax normalization matches the cash flow benefits with the associated costs. * * * Only steady growth can mask the adverse cash flow consequences arising from the rate recognition of costs at a different time from rate recognition of associated tax benefits under flow-through." FERC Order No. 144, *supra,* p. 83 (46 Fed.Reg. 26628–26629). Neither OPC nor the dissent comes to grips with this analysis. [PSC Formal Case No. 748, Order No. 7505 at 12 n. 8.]

▮ Although the Commission clearly addresses the needs of the utility and investors in these orders, it does not slight the ratepayers as is suggested by OPC. The first two of the three reasons put forward for a general policy in favor of normalization can be most readily interpreted as ratepayer concerns. *See supra* at 1111. The PSC found that normalization results in an equitable distribution of tax benefits among all consumers, current and future, as op-

posed to only current ones, and that it lowers revenue requirements, and therefore rates, of the company over the life of property from which the relevant tax benefits derive.

Although OPC points to some evidence which supports the opposite conclusion, we cannot say that the determinations made by the PSC are not supported by substantial evidence. Therefore, giving the Commission due deference we affirm its decision to normalize construction overhead costs, the D.C. Franchise tax, and the tax savings from the federal corporate tax decrease.

■ A different problem is raised by the PSC's decision to reverse itself and adopt normalization treatment for the 4% ITC. The PSC has been specific in its reasoning for this change. The 4% ITC is a tax credit that is allowed for new investment in construction work (CWIP). In the past CWIP was included in PEPCO's rate base. Because ratepayers therefore paid a return to investors on those amounts, the Commission reasoned that associated tax benefits should be "flowed through" to those ratepayers.

In Formal Case No. 685, the PSC ordered that CWIP be removed from the rate base. The Commission decided, because current customers were no longer paying a return on CWIP, that they would no longer get the benefit of the 4% ITC. The Commission further noted that this treatment would be required when the Economic Recovery Act of 1981 became effective.

We certainly have no basis to question the Commission's judgment based only on the foregoing; it is a decision amply supported by the record. OPC points out, however, that the reasoning may be based on a mistaken premise and therefore the decision may be subject to reversal. OPC argues that, because of various exceptions to the

order removing CWIP from the rate base during the test year used in this case, CWIP may still have been included, to a large extent, in the rate base. See OPC brief at 15–17.

The PSC replies to this contention that this challenge was never made during the hearings on the rate increase application. Indeed, it was first noted by OPC in its application for reconsideration and was not supported with any evidence in the record until the briefing of this appeal. We decline to unravel a complicated ratemaking process and direct further hearings on the basis of information developed so late in the proceedings. See Potomac Electric Power Co. v. Public Service Commission, 402 A.2d 14, 19 (D.C.1979). This is especially true where, as here, the amount in question is such a small portion of the total rate base that its elimination would have but a slight effect on rates. People's Counsel v. Public Service Commission, supra note 3, 399 A.2d at 50. Accordingly, we uphold the Commission's decision to normalize the 4% ITC.

### IV. The WMATA Rate Increase

■ In the order on appeal the Commission changed the interclass rate design,[6] equalizing the rate of return paid by Metro under PEPCO's Rapid Transit (RT) schedule (Metro is the only customer in this "class") with that paid under the General Service (GS) schedule which sets out the rates for PEPCO's other large commercial customers. WMATA objects that this decision was not supported by substantial evidence in the record. More specifically, while WMATA does not appear to deny that some increase was appropriate, it argues that the decision to equalize the rates of return paid under the RT and GS schedule is not supported by specific data showing that the costs of supplying electricity to customers in these two

---

**6.** Rate design refers to the differences in the rates charged to different classes of the consumers of a particular utility. The problem faced by a utility is to distribute the "burden of meeting [the utility's] revenue requirements *fairly* among customers and [ ] design rates 'to discourage the wasteful use of public utility service while promoting all that is economically

justified in view of the relationships between costs incurred and benefits received.'" Priest, *supra* note 1, at 329, citing Bonbright, *Principles of Public Utility Rates,* 291–93 (1961). That these differences will exist, for example, between commercial and residential customers of an electrical utility, is unquestioned in practice and theory.

classes are the same. Nothing short of this evidence, WMATA contends, will satisfy the requirement of substantial record evidence to support the Commission's decision to grant the rate design alteration.

We do not agree. It is our function to ensure that the rate design employed by PEPCO is "reasonable, just, and nondiscriminatory." D.C.Code § 43–501 (1981). In assessing this we must assure that "the Commission . . . consider whether customers had paid different amounts for the same service under similar circumstances." *Atlantic Telephone Co. v. Public Service Commission,* 390 A.2d 439, 444 (D.C.1978). The Commission's judgment was that the service provided Metro was similar enough to the service provided to customers in the GS class as to compel the equalization of those rates of return.

This decision was supported by substantial evidence. The record indicates that, while Metro's consumption of electricity is a relatively small part of PEPCO's output, it is growing rapidly, and indeed, is the fastest growing single customer load on PEPCO's system. (Record at 1080–81, 1670.) Evidence further indicates that marginal plant costs—those costs associated with increases in generating capacity that involve investment in PEPCO's physical plant—are higher than embedded costs. (Record at 1661–66.) Due to its rapid expansion, Metro is forecast to account for a large percentage of the total growth in PEPCO's generating capacity in the next decade (Record at 1089–92), and, therefore, will bear the greatest responsibility for PEPCO's increasing marginal costs.

Contrary to WMATA's position, the PSC was not required to quantify the amount of PEPCO's marginal costs for which Metro was responsible and relate it to the WMATA rate increase. In *Apartment House Council of Metropolitan Washington, Inc. v. Public Service Commission,* 332 A.2d 53, 57 (D.C.1975), we stated that "[i]t is not necessary that differences in rate of return be specifically and quantitatively supported by customer class-cost considerations." This

language appears to condone differences among the rates charged to different customer classes, a proposition which is not in doubt in this jurisdiction. In fact, in *Apartment House Council* we allowed a rate increase which had a disproportionately larger effect on certain classes. We quoted with approval the Commission's conclusion that:

[W]e . . . require that the greater burden of necessary rate increases be imposed on the classes of customers and quantities of use that appear largely responsible for capacity expansion and increased unit cost investment by PEPCO. [*Apartment House Council, supra,* 332 A.2d at 55 (quoting Formal Case No. 596, Order No. 5614, at 18–21, Nov. 16, 1973) (footnotes omitted).]

In support of that conclusion, we noted the Supreme Court's language in *Colorado Interstate Gas Co. v. Federal Power Commission,* 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945), "[a]llocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science." *Quoted in Apartment House Council, supra,* 332 A.2d at 57.

In the present case the Commission considered evidence indicating that Metro has characteristics similar to PEPCO's GS customers who account for a large proportion of PEPCO's total demand, grow at a greater rate than other classes, and pay higher rates for electricity. (Record at 1080–96, 1670–71.) Under these circumstances we cannot say that unreasonable or discriminatory rates have been levied against WMATA and we defer to the Commission's decision.

### V. Compliance Filing

In the final stage of a ratemaking proceeding such as this one, the affected utility must file with the Commission new payment schedules for its various customers and classes revised to reflect any approved rate increase or change in the rate design. Copies of the revised rate schedules are made available by the Commission, once

filed, to any party that requests them. The PSC, after a technical review of the new schedules, will approve them and specify a date upon which they will become effective. In this case, the PSC decision was announced on December 23, 1981. On December 29, PEPCO made the required filings and on December 30, the Commission issued Order Nos. 7457 and 7458, the first embodying the rate increase and changes in rate design announced in the December 23 decision and the second approving the compliance filing submitted by PEPCO.[7] WMATA and the People's Counsel claim that precedent and District of Columbia statutory law require further procedure to be followed prior to the approval of the revised rate schedules.[8] We disagree.

The section of the Public Service Commission Law which applies to the revision of rate schedules is set out in D.C.Code § 43–901 (1981):

> All public utilities to which an order of the Commission applies shall make such changes in their schedules on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any public utility in any such rates, tolls, or charges, or in any

joint rate or rates, without the approval of the Commission. Certified copies of all other orders of the Commission shall be delivered to the public utility affected thereby in like manner, and the same shall take effect within such reasonable time thereafter as the Commission shall prescribe.

It is clear that this section does *not* envision an adjudication of the rights of parties but, rather, consistent with the position of PEPCO and the PSC, outlines a technical procedure between the Commission and the affected utility. It is, in other words, an administrative detail. Neither is there any precedent in this jurisdiction which requires that revised schedules be subjected to adjudicatory procedure after a *final* ratemaking order based on substantial evidence has set out specifically how rates and rate design will be changed.[9]

An interpretation of the compliance filing stage of ratemaking as one appropriately left to the Commission's technical expertise and discretion does not seem unreasonable. Interested parties, in this case, for example, were able to air their objections to the proposed increases and changes in rate design during lengthy proceedings which pro-

---

**7.** In Order No. 7457, at 88, the Commission states:

> 3. That upon receipt of such rate schedules from PEPCO, the Commission shall undertake a review of their compliance with this Order, and that in the event they are found to be in compliance, the Commission shall approve such rate schedules and permit them to go into effect.
>
> 4. That upon *subsequent* approval by the Commission of rate schedules herein ordered to be filed by PEPCO, this proceeding is terminated. [Emphasis added.]

OPC argues, because Order No. 7457, although announced earlier, did not become effective until December 30, the Commission's approval of the rate schedules on the same day was inconsistent with the "subsequent" language of the order. In view of the fact that the substance of the decision was announced a week earlier, we find this argument overly technical. Adopting a technical approach ourselves, we note that the Order Numbers (7457 for the underlying order; 7458 for the schedule approval) indicate that the approval was "subsequent," even if on the same day.

**8.** In view of our resolution of this issue, we reject OPC's statutory and WMATA's due process challenge to the procedures used in the compliance filing stage of these proceedings. This is not an adjudication of the rights of parties to which procedural due process rights attach, *see, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), but rather a post-adjudication process of compliance. Hence there is no violation of any statutory or constitutional right.

**9.** WMATA's reliance on *Goodman v. PSC,* 309 A.2d 97 (D.C.1973) is misplaced. The compliance filings in that case were required to aid in determination of rate design and rate structure. These determinations have already been made in this case and, as we have said, they are supported by substantial evidence. Because we have found the record complete with regard to the issues on appeal here, the filings do not have the same importance they had in the *Goodman* case.

duced a record of over ten thousand pages. These objections were fully considered by the PSC in reaching its decision. The terms of this decision are unambiguous. The decision spells out the overall rate increase and the changes in rate design. At this point in the proceedings, given subsequent approval by this court, the substantial rights of the parties have been fully adjudicated. The process of dividing the total amounts due from classes and customers into periodic payment schedules is uncomplicated by comparison and seems appropriate for abbreviated, technical treatment. In the absence of any statutory requirement or precedent for different treatment, and in the interests of keeping the administrative process as unburdened as possible by procedural complexity and of ensuring that rate and rate design changes deemed necessary are implemented as quickly as is feasible, we defer to the Commission's judgment as to how compliance filings should be reviewed prior to approval.

We note additionally that the Commission has agreed that it may be appropriate to cease its unwritten "practice" with regard to compliance filings and, to that end, plans to issue a notice of proposed rulemaking "to give all interested parties an opportunity to participate in the formulation of rules governing compliance filing requirements and procedures." Order No. 7505 at 15.

On the basis of the foregoing analysis we affirm the Commission's orders in all respects.

*So ordered.*